United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 4, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 03 - 50926

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

TERRY RAY PENNELL,

Defendant - Appellant

---

Appeal from the United States District Court
for the Western District of Texas

---

Before DAVIS, SMITH and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant-Appellant Terry Ray Pennell (Pennell), appeals his conviction on four counts of money laundering under 18 U.S.C. § 1956 on the ground that the evidence is insufficient to support his conviction. In addition, Pennell challenges the calculation of loss in his pre-sentence investigation report (PSR) and also argues that the district court committed <u>Booker</u> error by using extra-verdict facts to compute the loss under a mandatory guidelines regime. We affirm the conviction but vacate the sentence and remand for re-sentencing.

-1-

Defendant Pennell was the President and sole owner of Rescom DataTech, Inc. (Rescom), a data cabling company located in Pflugerville, Texas. City National Bank (CNB)was a financial institution, located in Austin, Texas, which owned the Business Manager Software program (BMS). BMS allowed CNB to engage in "factoring" agreements, that is, agreements whereby CNB advanced money to small business owners which assigned its accounts receivables to the bank as collateral for their loans.

In March 1999, Pennell, on behalf of Rescom, opened a BMS account with CNB. The factoring agreement authorized and required Pennell to provide CNB with all invoices that represented Rescom's *completed work* for which payment was due. In turn, CNB deposited 80 percent of the value of the invoices less a fee into Rescom's operating account and 20 percent into a "reserve account" for Rescom. Rescom was required to maintain a balance of 20 percent of all outstanding invoices in the reserve account. If the invoiced customer failed to pay the invoice within 120 days of submission, the agreement required Rescom to buy back the invoice from CNB. Once CNB received full payment for the amount loaned on an invoice, the 20% reserve was released and available for Rescom's use.

Under the agreement, Rescom's balance on outstanding receivables in the reserve account could not exceed $250,000. In

June of 1999, this was increased to $400,000.

Beginning in March 1999, Pennell began transmitting invoices to CNB. For every transmitted invoice, CNB transferred 80 percent of the total invoiced amount to Rescom's operating account, less a fee. Consistent with the agreement, twenty percent of the invoiced amount was placed in the reserve account.

The record indicates that, though he knew he could only submit invoices for completed work to CNB, Pennell nevertheless submitted a number of invoices for both work not yet performed (premature invoices), which totaled $479,000, and work that was never in fact contracted to be performed (bogus invoices), totaling $362,000. These invoices, combined with the legitimate Rescom invoices for completed work, amounted to a total of $1,200,000.

Around October or November 1999, Tom McDonald (McDonald) took over the BMP and noticed that Rescom's receivable term was very slow and its account unprofitable. McDonald and Pennell discussed several issues, including an increase in CNB's fee, Rescom's obligation to maintain the reserve account at a level of 20% of the value of the outstanding invoices and the need for Rescom to submit current financial statements to CNB for analysis. Shortly after this meeting, McDonald informed Pennell that, because some receivables were about to reach the 120-day mark, Rescom needed to replenish the reserve by temporarily placing 100% of the proceeds from all incoming invoices into the

-3-

reserve account (rather than the usual 80/20 split). At this time, Rescom was also required to repurchase a number of overdue invoices. McDonald memorialized this discussion with Pennell in a letter dated January 18, 2000. In response, Pennell told McDonald that he expected to acquire a large account generating receivables in the range of $150,000 to $200,000 from George M Construction (George M), a large Houston, Texas construction company.

In late 1999, after Rescom completed four or five small projects for George M, Pennell met with Charlie Cox (Cox), a George M foreman. Pennell told Cox that he wanted to submit an invoice to George M in the amount of $200,000 so he could then sell it to CNB, in order to cover an invoice from a cancelled job. Cox informed Pennell that he would ignore any such invoice because Rescom had not done that much work for George M. On January 27, 2000, Pennell submitted five invoices to CNB, four of which were to George M, and CNB disbursed funds to Pennell's accounts. Among these invoices was Invoice #2956, a bogus invoice which purported to cover work for George M in the amount of $196,348. Rescom submitted several other bogus George M invoices.

After CNB advanced funds on invoice #2956, Pennell transferred $63,718.24 to the reserve account to replenish it. The reserve had dipped below its required 20% because Pennell had been forced to buy back several old premature and bogus invoices

-4-

which purportedly covered work done for Gonzales Independent School District (GISD) and Carroll Systems.

In March 2000, after McDonald repeatedly attempted to contact George M about George M's failure to pay on its invoices, CNB learned that Invoice #2956 was fraudulent. CNB then terminated the agreement with Rescom.

In August 2000, Pennell filed for bankruptcy.

Pennell was indicted on various offenses, including bank fraud (count 1), 13 counts of wire fraud (counts 2 - 14), bankruptcy fraud (count 15), three counts of money laundering under 18 U.S.C. § 1957 (counts 16 - 18); and four counts of money laundering under § 1956 (counts 19 - 22). Count 15 was severed and dismissed. The remaining counts were tried to a jury. The district court granted acquittal as to count 1, and the jury acquitted Pennell of one of the wire fraud counts (count 2). On the other counts (Counts 3 - 14 and 16 - 22), the jury found Pennell guilty. At sentencing, Pennell objected to the calculated loss amount in his PSR and the fact that this amount was not found by the jury. The court overruled Pennell's objections and sentenced him to 41 months' imprisonment.

## II.

Pennell argues first that the district court erred in overruling his motion for acquittal on the § 1956 money

laundering counts[1] (counts 19 - 22).  We apply *de novo* review to a challenge to the sufficiency of the evidence, viewing the evidence in the light most favorable to the verdict and upholding the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt.  U.S. v. Brown, 186 F.3d 661, 664 (5th Cir. 1999), citing U.S. v. Giraldi, 86 F.3d 1368, 1371 (5th Cir. 1996), U.S. v. Restrepo, 994 F.2d 173, 182 (5th Cir. 1993).  That is, we "do not evaluate whether the jury's verdict was correct, but rather whether the jury's decision was rational".  U.S. v. Miles, 360 F.3d 472, 477 (5th Cir. 2004).

---

[1] 18 U.S.C. § 1956 provides in relevant part that:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
(A)(i) with the intent to promote the carrying on of specified unlawful activity...; or
(B) knowing that the transaction is designed in whole or part –
(i) to conceal or disguise the nature, the location, the sources, the ownership, or the control of the proceeds of specified unlawful activity...
has committed the offense of money laundering under this section.

Under § 1956, the government was required to prove the following elements to convict Pennell: (1) Pennell conducted or attempted a financial transaction, (2) which he knew involved proceeds arising from unlawful activity, (3) with the intent to promote or further those illegal actions, or (4) with the knowledge that the transaction's design was to conceal or disguise the nature or source of the illegal proceeds. See U.S. v. Brown, 186 F.3d at 668, citing U.S. v. Cavalier, 17 F.3d 90, 92 (5th Cir. 1994).

Pennell does not contest the first two elements of the money laundering charge, but rather, maintains that the government failed to provide evidence to establish either the third or fourth elements of this test. Pennell contends that, rather than being used for the promotion or furtherance of fraud, the funds were used to pay Rescom's ordinary business expenses and so his actions do not constitute money laundering under § 1956. See U.S. v. Brown, 186 F.3d 661 (5th Cir. 1999). Considering the evidence in the light most favorable to the verdict, we are satisfied that the money laundering counts are supported by sufficient evidence.

Counts 19 and 20 of the indictment involved Pennell's transfer of funds from the Rescom operating account to repurchase premature invoices #2868 and #2875. Counts 21 and 22 charged Appellant with similar transfers from the operating account to

the reserve account to facilitate the buy back of bogus invoices # 2830, 2850, 2853, and 2938.

As the government argues, the evidence shows that Appellant submitted invoice 2956 to CNB in January of 2000. The government established that this invoice, made out to George M. in the amount of $196,349.00 was a bogus invoice. Charlie Cox, George M's construction superintendent, testified that Rescom did not do the work detailed in the invoice. These fraudulently obtained funds were then deposited into Rescom's operating account and, as of January 27, 2000, constituted 94.70% of the funds in the operating account.

After this transfer, Pennell used funds from the reserve account to repurchase the overdue invoices underlying Counts 19 - 22. All six of those invoices (#s 2830, 2850, 2868, 2875, 2938) were established by the Government to be either premature or bogus invoices. Given that Pennell knew that #2956 was a bogus invoice, the jury could reasonably have found that Pennell knowingly used the proceeds from a bogus invoice to fund the repurchase of other bogus and premature invoices in order to facilitate his illegal scheme. The jury was entitled to find that Pennell had good reason to believe that CNB would terminate its relationship with Pennell if he failed to replenish the reserve account and repurchase the past due fraudulent invoices. Under this view of the evidence, Pennell made these transactions to induce CNB to continue to advance funds on the fraudulent

-8-

Rescom invoices. Thus, we find that the evidence was sufficient to support Pennell's conviction on the four counts of money laundering under § 1956.

### III.

### A.

Pennell argues that the district court erred in calculating the amount of the loss under U.S.S.G. 2B.1.1(b)(1). The district court computed the loss at $835,294.59.

At sentencing, and on appeal, Appellant Pennell argues that the court should have selected for sentencing purposes the net loss to CNB ($234,552.48) or, at most, the total of the bogus invoices ($359,613.17) and should have included none of the "premature" invoices ($479,681.42) in calculating loss. He contended that none of the counts of conviction were based on premature invoices. Appellant does not seriously challenge the propriety of the court's inclusion of the $359,613.17 in bogus invoices in the loss calculation. These invoices obviously fall within the meaning of "intended loss" since Appellant intentionally placed the bank at risk for the full value of these invoices. See U.S. v. Sowels, 998 F. 2d 249, 251 (5th Cir. 1993). Because the premature invoices were submitted to CNB before Rescom completed the work and before payment was due, the invoices were not receivables when furnished to CNB. If, for any reason, Rescom had not completed the job, CNB was at risk of

losing all funds it advanced on these invoices.

We conclude, therefore, that the district court did not err in including the premature invoices in the amount of loss calculation.

B.

Appellant also argues that the district court committed Booker error by using extra-verdict facts to compute the loss under a mandatory Guideline regime in violation of his Sixth Amendment rights. He contends that he preserved this objection in the district court when he made the following statement:

Mr. Orr: The base offense level, we think, should be calculated on a net loss to the victim, and it's inappropriate to include the premature invoices using the terminology we all used a trial. We feel that that shouldn't be in there because they were intended to be repaid clearly. They were repaid. What we're talking about is getting money in advance as opposed to perhaps fraudulently, and he wasn't convicted of any of those.

So we think it's entirely inappropriate to punish him for anything that he wasn't convicted of. And if you do that, that gets him down to the next lower level of between 200 to 400.

Record, Volume 7, page 2, line 15-3 - page 3, line 1. In the context of the entire statement, we conclude that counsel's objection simply challenged the Court's calculation of the amount of the loss under U.S.S.G. 2 B 1.1(b)(1). We do not read the

-10-

objection as one addressing the use of the Guidelines as mandatory or depriving the defendant of his Sixth Amendment right to jury trial.

Because the error was not preserved, we apply plain error review.  As the Court stated, in U.S. v. Cotton, "an appellate court may not correct an error that the defendant failed to raise in the district court unless there is '(1) error (2) that is plain and (3) that affects substantial rights.'" U.S. v. Cotton, 535 U.S. 625, 631 (2002).  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Id.*

The first two prongs of the plain error test are easily met. As discussed above, the district court erred in using extra-verdict facts - not admitted by Pennell - to calculate the amount of the loss under a mandatory Guidelines regime.  Since the Supreme Court's decision in Booker, this error is also plain in the sense that it is "clear" or "obvious".  U.S. v. Olano, 507 U.S. 725, 734 (1993).  It is enough that the law was settled at the time of appellate consideration to make the error plain.  Johnson v. U.S., 520 U.S. 461, 468 (1997).

The third prong of the plain error test is more difficult for the appellant to establish.  Appellant bears the burden of showing

that the error affected his substantial rights.  This means that Pennell must establish that the sentencing Court's use of a mandatory rather than an advisory Guidelines scheme actually affected the sentence.  To carry this burden the appellant must ordinarily point to statements in the record by the sentencing judge demonstrating a likelihood that the judge sentencing under an advisory scheme rather than a mandatory one would have reached a significantly different result. See U.S. v. Mares, No. 03-21035, 2005 U.S. App. LEXIS 3653, at *27-28 (5th Cir. 2005).

Although Appellant has a difficult burden to establish that the error affected his substantial rights, we are persuaded that he has carried his burden in this case.

In ruling on Pennell's objection to the Court's interpretation of the Guidelines preference for computation of loss based on intended loss rather than actual loss the court stated:

Court:     All right. I think I have to overrule your objection. Once again, I say that from many standpoints of fairness and justice, it might be better to sentence people just based on actual loss, but I don't think that's the way the guidelines are written or the appellate courts interpreted them in most cases. So I feel constrained to overrule your objection.

Vol 7, page 9, lines 17 - 23. Based on this statement, we are persuaded that it is likely that if the district court had thought that he was at liberty to select a loss figure other than intended loss he would have done so and would have arrived at a lesser sentence.

The district court sentenced Pennell at the bottom of the Guideline range and also made the remark - pointed to by the government - that this "would be sufficient to bring about a just resolution of this case."  While the district court may not have considered the sentence it imposed unjust, this does not negate the statement quoted above that had he been free to do so he would have selected a different loss figure which would have resulted in a lesser sentence.

Finally under the fourth prong of plain error review we consider whether the "plain error" at sentencing "seriously affected the fairness, integrity or public reputation of judicial proceedings."

The district court in this case indicated that "fairness and justice" might be better served if defendants such as Pennell were sentenced based on actual loss rather than intended loss which would result in a lesser sentence than the one the district court felt constrained to impose.  Under these circumstances, Pennell has carried his burden to establish the fourth prong of the plain error test. This is consistent with this Court's opinion in U.S. v. Gracia-Cantu, 302 F.3d 308 (5th Cir. 2002).

> The dramatic increase in the recommended imprisonment range and in Gracia-Cantu's actual term of imprisonment affected his substantial rights. *See United States v. Williamson,* 183 F.3d 458, 464 (5th Cir. 1999)(concluding that a two-fold increase in prison time affected the defendant's substantial rights). Such a sentencing error also seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Aderholt*, 87 F.3d 740, 744 (5th Cir.

1996) (finding that "the fairness and integrity of this judicial proceeding were seriously affected" by sentencing calculation errors). Thus, the district court's sixteen-level enhancement of Gracia-Cantu's offense level constituted plain error.

Id. at 313. We leave open the question of whether a panel can, under these or similar circumstances, vacate a sentence and instead of requiring resentencing, permit the district court to determine whether it would have imposed the same sentence had it known the Guidelines were advisory and based on this decision, determine whether it wishes to reinstate the same sentence or resentence the defendant. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

IV.

For the reasons stated above, we affirm Pennell's conviction We, however, vacate his sentence and remand this case to the district court for resentencing consistent with Booker.