IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 11, 2007

Charles R. Fulbruge III
Clerk

No.  07-10100

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

JIMMY WHITEHEAD, also known as Jimmy Mark Edward Whitehead,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Texas
No. 4:06-CR-130-ALL

Before DAVIS, STEWART, and OWEN, Circuit Judges.

PER CURIAM:[*]

Jimmy Mark Edward Whitehead was prosecuted pursuant to 18 U.S.C. § 3112(a) for bank robbery, and pursuant to 18 U.S.C. § 924(c)(1)(A)(ii) for brandishing a firearm during a crime of violence.  His first trial ended in mistrial; a jury found him guilty of both crimes in a second trial.  On direct appeal, he argues that the district court erred by: (1) failing to dismiss at the conclusion of his first trial on double jeopardy grounds; (2) failing to suppress out-of-court and in-court identifications by two witnesses; (3) denying the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

defendant's motion for judgment of an acquittal due to insufficient evidence; (4) construing 18 U.S.C. § 924(c)(1)(A)(ii) as stating a minimum rather than a maximum prison term of seven years; and (5) denying the defendant's motion for a downward departure due to a purported sentencing disparity. We lack jurisdiction to address the fifth issue and otherwise affirm.

I

We first consider whether the district court erred in denying Whitehead's motion for judgment of acquittal pursuant to Rule 29.[1] Whitehead contends the evidence is insufficient to support his conviction for participating in the robbery of a credit union in Arlington, Texas and brandishing a gun during that robbery. We review challenges to evidentiary sufficiency de novo,[2] viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the conviction.[3] We will uphold the conviction if a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4]

The evidence reflects that a teller was accosted by two armed young black males wearing gloves, ski masks and coveralls as she entered the back door of the credit union at approximately 8:00 a.m. to prepare to open it for the day's business. Once inside, the robbers threatened to harm the teller if they saw a policeman. During the hold-up, the two gunmen spoke to at least one other accomplice using push-to-talk features of cell phones while inside the credit union. They absconded with $453,600 in cash, which they placed in a box after a plastic bag they had used to hold the bills split open. They also removed and

---

[1] See FED. R. CRIM. P. 29.

[2] United States v. Pennell, 409 F.3d 240, 243 (5th Cir. 2005).

[3] United States v. Redd, 355 F.3d 866, 872 (5th Cir. 2003).

[4] United States v. Hernandez-Bautista, 293 F.3d 845, 853 (5th Cir. 2002).

took a video surveillance tape. Once the robbers had fled, the teller called 911 at 8:26 a.m.

Cornelius Kiser lived down the street from the credit union, and the morning of the robbery he saw a black male wearing a white tank top walking down the street near the credit union. He thought this attire was odd because it was raining and cold that January morning. A few minutes later, Kiser observed the same man in the breezeway of an apartment complex across the street "grab a couple of bags and a box and leave."

Jorge Juarez lived in an apartment near the credit union and saw a black male wearing a white "muscle tee" walk back and forth from the street to an apartment stairwell for ten to fifteen minutes the morning of the robbery. Both Juarez and Kiser identified Whitehead from a photo line-up six months later, and Juarez identified Whitehead at trial.

Another area resident, Ernest Harden, a convicted sex offender, saw a black male throw something into bushes that stood in front of an apartment balcony across the street from his home at approximately 8:30 the morning of the robbery. The man Harden observed wore a white "muscle shirt" and appeared to be talking on a cell phone.

The day after the robbery, Jackie Sue Kyles, who lived in the apartment with the balcony Harden identified, found a ski mask and gloves on her balcony and called police. Whitehead's DNA was found inside both gloves but not on the ski mask. The DNA of Edward Crain and unidentified others was found on the ski mask.

Edward Crain was apprehended about three months after the credit union robbery and confessed to participating in it. He also admitted to participating in two subsequent bank robberies carried out with similar methods. During initial questioning, Crain did not name Whitehead as a participant in any of the crimes, but he ultimately told authorities and testified at Whitehead's trial that

Whitehead was the lead person in the credit union hold-up, although he said Whitehead played no part in the other robberies.

Crain gave detailed testimony at Whitehead's trial about Whitehead's role in planning and executing the credit union robbery and the division of its proceeds. Crain testified that he robbed the Arlington credit union along with Whitehead, Chuck Oliver, and Jimmy Whitehead's brother, George Whitehead. Prior to the robbery, the four men conducted surveillance of the credit union. The morning of the robbery, Crain, Oliver, Whitehead, and Whitehead's brother drove to the credit union in two vehicles. They brought gloves, ski masks, two pistols, and three phones. Whitehead's brother remained in one vehicle with a phone and a police scanner. Crain, Oliver, and Whitehead drove the other vehicle closer to the credit union. Originally, Crain and Oliver had planned to enter the credit union, so Crain brought his own ski mask, which he had worn many times, and gloves, which were new. The robbers changed their plans just before the robbery, however, and decided instead that Whitehead would enter with Oliver, and that Crain would be the getaway driver. Crain gave his ski mask and gloves to Whitehead. Crain and Whitehead each took a phone. Crain then sat in the car and watched Whitehead and Oliver confront the teller at the credit union's back door. About 20 minutes later, Oliver reappeared at the back door and waved for Crain to pull up. Oliver got in the vehicle and reported that Whitehead was still inside with the teller. Crain noticed it was raining at this point. He and Oliver circled the credit union; they could not find Whitehead, so they drove away and found his brother. Whitehead's brother and Oliver then returned to the credit union to pick up Whitehead. When the three men reunited with Crain, Whitehead was wearing a white tank top, carrying a box of money and blue bags, and missing his mask and gloves. The four went to the home of Lisa Wright, where Whitehead stayed at times, to divide the cash. Crain also testified that prior to the credit union robbery, Whitehead was "poor,"

4

but afterwards, he drove vehicles with expensive accessories and paint jobs, wore expensive jewelry, bought gold "grills" for his teeth, and spent considerable sums at bars with topless female entertainers.

Whitehead contends that Crain's testimony is unreliable because he is an unindicted co-conspirator[5] and because he previously lied to investigators and did not implicate Whitehead in the credit union robbery until just before trial. Whitehead's contentions are familiar, and we have consistently rejected similar arguments.[6] The weight and credibility of Crain's testimony were matters for the jury.

Whitehead contends that the eye-witness testimony was unreliable. Kiser was not "one hundred percent sure that [Whitehead] was the same person he saw across the street the day of the robbery," and Kiser was shown a photo lineup days before testifying. Juarez's testimony "varied greatly between the two trials" and conflicted, and Harden "did not positively identify" Whitehead as the person who ran past Harden's residence. Whitehead also contends the DNA evidence is inconclusive since DNA in addition to Whitehead's was found on the gloves and Crain's DNA, but not Whitehead's, was found on the ski mask. Again, these are matters for the factfinder to weigh. We note with regard to the DNA evidence that in a post-arrest interview, Whitehead denied that he ever wore or touched the gloves at issue. The jury could have viewed this denial as incriminating.

Viewing all of the evidence in the light most favorable to the government, we must conclude that a rational juror could have found the crimes' essential elements beyond a reasonable doubt.

---

[5] The federal authorities did not prosecute Crain, but Crain was prosecuted and convicted in state court.

[6] See United States v. Silva, 748 F.2d 262, 266 (5th Cir. 1984) ("[A] conviction may be based solely upon the uncorroborated testimony of an accomplice if the testimony is not incredible or otherwise insubstantial on its face.").

II

Whitehead contends that he was placed in double jeopardy when he was subjected to a second trial, citing Oregon v. Kennedy.[7] We review de novo the district court's denial of a motion to dismiss based on double jeopardy,[8] but we accept the district court's underlying factual findings unless they are clearly erroneous.[9]

The Double Jeopardy Clause does not normally prohibit retrial, if the second trial results from a mistrial that the defendant requested.[10] The "narrow exception" to this rule is that the "prosecution may not engage in misconduct intended to provoke mistrial requests."[11] "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."[12] Our inquiry focuses not on whether the prosecution "harassed" or "overreached," but on the factual issue of whether the prosecutor intended to produce a mistrial.[13]

The district court explicitly found that the prosecutor did not intend to provoke the defense to move for a mistrial:

---

[7] 456 U.S. 667 (1982).

[8] United States v. Botello, 991 F.2d 189, 192 (5th Cir. 1993).

[9] United States v. Gonzalez, 76 F.3d 1339, 1342 (5th Cir. 1996).

[10] United States v. Weeks, 870 F.2d 267, 269 (5th Cir. 1989) ("Ordinarily, however, where the first prosecution has terminated on the defendant's own motion for a mistrial, the government is not barred from putting the defendant to trial again." (citing United States v. Tateo, 377 U.S. 463, 467 (1964)).

[11] Id.

[12] Oregon v. Kennedy, 456 U.S. 667, 676 (1982).

[13] Id. at 675.

> I find that misconduct on the part of the prosecutor caused the Court to grant the mistrial, but that doesn't justify granting of the double jeopardy defense. The Supreme Court is real clear that I cannot find that there's . . . double jeopardy unless I find that the prosecutor intended by his conduct to cause a mistrial. I cannot make such a finding. I think it was a matter of [the prosecutor] seeing what he could get away with, thinking it would help him in the trial. But I don't think he wanted a mistrial.

This finding was not clearly erroneous. A mistrial was granted because during the first trial, after had Crain testified that Whitehead purchased vehicles, clothing and consumer electronics following the credit union robbery, the prosecutor asked "Do you know what else he was spending his money on?", and Cain responded "Drugs." Whitehead's counsel moved for a mistrial.

The district court had granted a motion in limine prior to the first trial to exclude evidence that Whitehead used credit union robbery proceeds to buy drugs. After Crain answered "Drugs" during the first trial, the district court held a hearing, and Crain testified that on the morning of the first trial, the prosecutor told Crain and the other witnesses not to mention drugs. Crain recounted that the prosecutor "said there was a motion in limine; cannot use the word drugs in any way, shape, form, or matter. No matter what I ask you, don't use the word 'drugs.'" Crain explained that he nevertheless answered "drugs" because he was "nervous and a little bit confused about the question and the situation."

The government actively opposed the defense's request for mistrial. The prosecutor immediately explained to the judge that he had explicitly instructed Crain not to testify about drugs, and the prosecutor stated he was trying to elicit Crain's description Whitehead's expenditures at strip clubs and on a "diamond grill" for his teeth. The government offered a possible solution to lessen the impact of the testimony and to continue the trial. This evidence supports the district court's finding.

The defense argues the prosecution's case improved significantly between the first and second trial, and that this improvement is evidence of prosecutorial intent to provoke the defense to move for a mistrial. Relatedly, it claims the prosecution's initial case was so weak during the first trial that we can infer the government deliberately brought about the mistrial.

Whitehead argues that eye-witness Harden was impeached when it was revealed on cross-examination that he was a convicted sex offender. The prosecution brought out this damaging fact in its direct examination of Harden at the second trial. Whitehead also notes that at the first trial, Juarez testified that he first met with a particular investigator a few weeks after the robbery, when in fact, the meeting occurred six months after the robbery. Whitehead asserts this conflict in the Juarez's testimony would have been apparent and significant had the first trial continued. Additionally, Whitehead notes, at the first trial, Kiser was asked if the person he observed the morning of the robbery was present in the courtroom during the first trial, and Kiser declined to identify the defendant. The government did not pose the same question in the second trial. Even assuming an inference of intent to goad the defense into moving for a mistrial could be gleaned from these various circumstances, they do not render the district court's finding of no intent clearly erroneous.

### III

Whitehead moved unsuccessfully in the district court to suppress the in-court and out-of-court identifications of Whitehead by two witnesses, Juarez and Kiser, on two primary grounds. He maintains these challenges to the admission of this evidence on appeal. We accept a trial court's factual findings that underlie a ruling on a motion to suppress unless they are clearly erroneous.[14]

---

[14] United States v. Hefferon, 314 F.3d 211, 217 (5th Cir. 2002).

The question of whether an identification is constitutionally admissible is a mixed question of fact and law.[15]

Whitehead contends the government violated his due process rights by using an impermissibly suggestive photograph lineup to elicit positive identifications from two witnesses. Courts determine whether a photographic lineup violates a defendant's due process rights by using a two-part test. First, they ask if "the procedure was impermissibly suggestive."[16] If the lineup was too suggestive, the issue is "whether this created a very substantial risk of misidentification."[17]

The photographic lineup was not impermissibly suggestive. The witnesses were shown a sheet containing six pictures of young adult black males. They were told they did not have to choose any of the individuals. The witnesses were further instructed not to focus on aspects of a person's appearance that are susceptible to change, such as hairstyle and facial hair, but rather to focus on unchangeable features such as "their ears, their eyes, [and] their nose."

Whitehead claims the lineup, when combined with the instructions, impermissibly suggested that witnesses should select his photograph, because he is the only person in the lineup with a "facial deformity." He asserts that he has a "lazy eye" that is "so manifestly apparent that without other alternatives to select from, the photo lineup was tantamount to a show up." We disagree based on a review of the photographic lineup. It is not suggestive. Nor were the investigating agents' comments or instructions.

Whitehead's second principal argument is that the government violated his Sixth Amendment rights by failing to notify his attorney prior to conducting

---

[15] Id.

[16] United States v. Atkins, 698 F.2d 711, 713 (5th Cir. 1983).

[17] Id.

the photographic lineup. He argues that United States v. Wade[18] requires the government to notify counsel before showing witnesses a photographic lineup containing the defendant. The Supreme Court foreclosed this argument in United States v. Ash,[19] when it stated, "We hold . . . that the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender."[20] We therefore reject this argument.

## IV

The district court sentenced Whitehead to 240 months' imprisonment for the bank robbery conviction and 120 months' imprisonment based on the conviction for brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii), with the terms of imprisonment to be served consecutively. The court further ordered Whitehead to pay restitution of $453,600 and a special assessment of $200. Finally, the district court imposed a supervised release term of three years with respect to the bank robbery count, and a term of five years for the weapons violation, to be served concurrently.

With regard to the 120 months' sentence, Whitehead contends that the district court incorrectly interpreted 18 U.S.C. § 924(c)(1)(A)(ii) as setting forth a minimum seven-year sentence, contending that the statute sets forth a maximum seven-year sentence. Whitehead argues in the alternative that the provision is unconstitutional. We review the district court's interpretation of a

---

[18] 388 U.S. 218 (1967).

[19] 413 U.S. 300 (1973).

[20] Id. at 321.

federal statute de novo.[21]  We also review the constitutionality of a federal statute de novo.[22]

Whitehead's contention that 18 U.S.C. § 924(c)(1)(A)(ii) imposes a maximum punishment of seven years' imprisonment for brandishing a firearm during the commission of a crime of violence is contrary to the statute's unambiguous text and circuit precedent.  Section 924(c)(1)(A)(ii) provides that the offender "shall, in addition to the punishment provided for such crime of violence . . . if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years."[23]  This language plainly sets forth a minimum, rather than a maximum.  We have expressly rejected Whitehead's interpretation in previous decisions, noting that by using the "no less than" language, "Congress has implicitly authorized district courts to impose sentences . . . in excess of seven years and up to a maximum of life imprisonment."[24]

We also reject Whitehead's argument that if § 924(c)(1)(A)(ii) can be read to allow sentences greater than seven years, it fails to give defendants sufficient notice and is void for vagueness.  As explained above, the language is not vague.  In addition, we have previously held that a provision using "not less than" to establish a minimum sentence is "not unconstitutionally vague for failure to fix a maximum sentence."[25]

---

[21] United States v. Hebert, 131 F.3d 514, 525 (5th Cir. 1997).

[22] United States v. Luna, 165 F.3d 316, 319 (5th Cir. 1999).

[23] 18 U.S.C. § 924(c)(1)(A)(ii).

[24] United States v. Sias, 227 F.3d 244, 246 (5th Cir. 2000).

[25] United States v. Davis, 801 F.2d 754, 756-57 (5th Cir. 1986), abrogated by statute, 18 U.S.C. § 924, as stated in United States v. Affleck, 861 F.2d 97, 98 (5th Cir. 1988).

V

Prior to sentencing, Whitehead filed a motion for downward departure based on a purported disparity between the 30-year sentence he received and the 15-year sentence his accomplice Crain received as a result of his state-court prosecution and conviction for the credit union robbery. That motion was denied, and Whitehead maintains on appeal that the district court erred by failing to downwardly depart. Whitehead argues the difference between his and Crain's sentences constitutes a "sentencing disparity" for which the sentencing court should award a downward departure.

We de not reach the merits of this argument because we lack jurisdiction to do so. We possess jurisdiction "to review [a] district court's decision not to depart downward from the guideline range only if the court based its decision upon an erroneous belief that it lacked the authority to depart."[26] The record must indicate that the judge held such a belief. The record before us reveals no erroneous understanding. If anything, the record indicates the judge thought he could grant the departure, as he said he would consider it at sentencing. For these reasons, we conclude we lack jurisdiction to reach this argument.

Whitehead does not challenge the reasonableness of his sentence, nor does he contend that the district court improperly applied or weighed any of the factors set forth in 18 U.S.C. § 3553(a).

\* \* \*

For the foregoing reasons, we AFFIRM Whitehead's conviction and sentence.

---

[26] United States v. Lambright, 320 F.3d 517, 519 (5th Cir. 2003).