**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 21, 2012

Lyle W. Cayce
Clerk

No. 11-50477

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JOSE MARQUEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before STEWART, ELROD, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Jose Marquez pleaded guilty to a two-count indictment charging him with participation in drug and money laundering conspiracies. After conducting a hearing, the district court sentenced Marquez to life in prison on count one and to 240 months on count two. In imposing its sentence, the district court applied firearm and leadership enhancements. Additionally, a subsequently entered written judgment of conviction ordered Marquez to forfeit $2,000,000. On appeal, Marquez challenges the sentencing enhancements and the forfeiture order. For the following reasons, we affirm the district court's judgment.

No. 11-50477

## I.

## A.

On October 25, 2007, the Dallas Police Department was notified that Jose Marquez had been kidnapped from a local bakery he owned with his wife, Alma Rosa Marquez, and was being held captive for a $1,000,000 ransom. The FBI was notified of the kidnapping and began an investigation. The following day, the FBI executed a search warrant at a Duncanville, Texas, residence believed to be owned or rented by Marquez. While at this residence, agents discovered evidence of Marquez's kidnapping, along with an operational methamphetamine laboratory in a detached garage. Agents then seized the evidence and dismantled the lab. Three associates of Marquez were eventually convicted of crimes related to the kidnapping.

During their investigation, agents learned that beginning as early as 2005 and continuing into 2010, Marquez obtained large amounts of methamphetamine and cocaine from various suppliers, including sources in Mexico, and distributed the narcotics in Texas, Georgia, and Illinois. This investigation revealed that Marquez's son, Blas Marquez, assisted in the distribution of the narcotics and the collection of the money while Marquez's wife assisted in the laundering of the drug proceeds. During the time of the conspiracy, Marquez distributed in excess of 750 kilograms of cocaine, 556 pounds of methamphetamine, and laundered more than $24,064,000 in drug proceeds.

In the course of investigating Marquez's drug trafficking, case agents spoke with a number of cooperating individuals. Several of their statements to case agents warrant brief mention.

One cooperating individual informed case agents that Marquez had directed him to dismantle car batteries containing methamphetamine, taught him how to turn powdered methamphetamine into a rock form known as "ice,"

No. 11-50477

and told him where to deliver drugs and collect money. Another cooperator stated that Marquez asked him to find buyers for the methamphetamine and cocaine Marquez was distributing. According to this individual, Marquez also recruited him for a job collecting money. A third cooperating individual stated that he made drug deliveries for Marquez, collected money from the drug sales, and delivered the funds to Marquez. Finally, a fourth person who cooperated with agents remarked that Marquez had him retrieve money in Atlanta and directed him to deliver it to Marquez's wife in Texas.

**B.**

In October 2010, Marquez was charged with conspiracy to distribute at least 500 grams of methamphetamine and conspiracy to distribute at least five kilograms of cocaine (count one) and conspiracy to commit money laundering (count two). The indictment also contained notice of the government's forfeiture demand and request for a $2,000,000 money judgment that, according to the government, represented the proceeds of Marquez's criminal activity.

On March 17, 2011, Marquez pleaded guilty to both substantive counts of his indictment. At his rearraignment, the district court explained the nature of the charges against Marquez, the possible punishments related to the charges, and the rights he was waiving, but did not mention the government's forfeiture demand. The sole reference to forfeiture made during the rearraignment was made by the prosecutor who, after reading the charges brought against Marquez, mentioned that there was "also a forfeiture count that has been summarized at the back of the indictment." Notably, the record does not indicate that the district court made a presentencing forfeiture determination, nor does it show that a preliminary order of forfeiture was entered.

Prior to Marquez's sentencing hearing, the probation office prepared a Presentence Investigation Report that, among other things, recommended that Marquez receive a four-level upward adjustment for being an organizer or

3

leader. The government objected to the PSR because it did not include an upward enhancement for the possession of a firearm in connection with the underlying drug offense. Marquez filed a written objection to the application of both enhancements.

Along with addressing potential sentencing adjustments, the PSR also mentioned forfeiture on two occasions. First, the PSR referenced the notice of forfeiture contained in the indictment, which, as stated above, requested a $2,000,000 money judgment. Second, it included two paragraphs setting forth the statutory basis for forfeiture in Marquez's case.

## C.

On May 16, 2011, the government filed a "motion for entry of a money judgment of forfeiture." In its motion, the government contended that as part of their guilty pleas, Marquez and his coconspirators agreed to voluntarily forfeit $2,000,000. The government also asserted that it had "proven, by a preponderance of the evidence," based on Marquez's and his coconspirator's guilty pleas and factual bases, that the $2,000,000 represented the amount of proceeds derived from the underlying criminal violations. The government requested that, at the time of sentencing, the money judgment be included in the judgments of Marquez and his coconspirators. Marquez did not file a response or object to the government's motion.

Marquez's sentencing hearing was held two days later. Before hearing from the government's witnesses, the district court asked Marquez if there were any matters related to the PSR that he needed to present. Aside from referring to his written objection to the application of the firearm and leadership enhancements, Marquez did not object to the PSR.

No. 11-50477

**1.**

To support the application of the firearm and leadership enhancements, the government presented the testimony of three case agents. The testimony of two of these agents is relevant for the issues raised on appeal.

Marcella St. John, a detective with the Dallas Police Department, was the government's first witness. In his testimony, he stated that, in October 2007, he became involved in the drug investigation relating to Marquez. As part of the investigation, he stated that he spoke with confidential informants regarding "Marquez and his possession of a firearm." At the hearing, St. John testified that "a worker for Mr. Marquez stated that it was common knowledge that Mr. Marquez was strapped, meaning he carried a firearm." St. John related that he was also told that, after the kidnapping incident, Marquez always carried a firearm because he feared for his life.

Additionally, St. John testified that another cooperator told him that, after the kidnapping, Marquez was always armed. The cooperator informed him that Marquez carried a semiautomatic handgun "in his waistband or in his pouch." St. John also stated that no firearms were found during a search of Marquez's home. This search did, however, reveal magazines for a Glock semiautomatic handgun and a bulletproof vest.

Along with his testimony regarding Marquez's alleged use of firearms, St. John also provided testimony relevant to the leadership enhancement. According to St. John, Marquez "was the head of an organization that distributed narcotics all over the United States including five different states." St. John testified that, based on his interviews with various individuals involved in the drug organization, Marquez was the leader of a particular cell. He also stated that Marquez was in charge of "making sure that drugs got to areas like Atlanta and Chicago and Virginia." St. John also related that he had learned that Marquez directed six other individuals in the drug organization.

No. 11-50477

On cross-examination, St. John stated that Marquez's role in the drug organization was 'to distribute the narcotics to people underneath him and to return the money to the source of [the drug] supply in Mexico." When asked by defense counsel if Marquez was "just a normal participant in this cell," St. John responded with the following: "No sir. He wasn't just a normal participant. He was the leader of this cell." St. John also noted that he had evidence, including wiretaps and interviews, showing that Marquez exercised leadership over the cell. When asked whether Marquez received a larger percentage of the drug proceeds, St. John could not provide a definitive answer. St. John did, however, know that Marquez profited from his drug activities.

After St. John finished his testimony, the government called Alex Zurfas, a DEA task force officer who was also involved in the investigation. Like St. John, Zurfas was used by the government to support the application of both enhancements. As relevant to the firearm enhancement, Zurfas testified that, through wiretaps, he learned that Marquez was "trying to purchase a .380 pistol and what sounded like an AR-15 assault rifle." Because he did not intercept any further conversations about these weapons, Zurfas surmised that Marquez must have successfully purchased the weapons. More specifically, Zurfas testified that "[i]t appeared they had set a time to meet later on in that evening and it appeared that the transaction actually happened." Zurfas further stated that "[m]any of the cooperators [had said that] Marquez would carry a weapon during deals, during transactions, [and] that it was not uncommon for him to have a gun with him while he was making contact with a customer."

As germane to the leadership enhancement, Zurfas stated that wiretaps revealed that Marquez "was in direct contact with the [drug] source in Mexico." He also testified that Marquez "gave directions to people in the United States on how to carry out their task of distributing drugs." In fulfilling his role in the conspiracy, Zurfas stated that Marquez would not stay "in one particular area,"

No. 11-50477

and that Marquez "would travel between Virginia, Florida, Atlanta, Texas and Mexico." Zurfas testified that "in those different areas," Marquez "would have people that maintained stash houses or locations to facilitate the importation as well as the sale of the controlled substances and the return of bulk currency." According to Zurfas, Marquez received all the money from the drug sales. If Marquez was not available to receive the money, Zurfas testified that Marquez instructed his workers to deliver the money to his wife. Zurfas stated that, in his estimation, Marquez was directing six or seven other participants in the conspiracy.

Relatedly, Zurfas testified that he intercepted a conversation between Marquez and Blas during which Marquez asked Blas "if he was ready to take the helm of the ship, meaning the distribution network that he'd established in Dallas." According to Zurfas, Blas responded in the affirmative. Zurfas further testified that Blas confirmed that "he was being groomed to take over as the leader of this cell."

On cross-examination, Zurfas was asked whether Marquez participated "in all the same activities" as the other members of the cell. In response, Zurfas stated that "Marquez had the luxury of controlling the price for which the dope was sold," which was something that "nobody else in the organization could do." He explained that the "leader can control the price that [the drugs were] sold for." When asked whether Marquez "profited more than any other participant," Zurfas stated that because Marquez controlled "the price that the product was sold for," he "profited more than anybody else did in the organization." Marquez did not present any evidence after the government concluded its presentation.

**2.**

Based on the information before it, the district court concluded that although the "ultimate supplier was obviously someone in Mexico," the evidence showed that Marquez "was an organizer or leader of the group or cell of which

No. 11-50477

he was a member." The court also found that the evidence showed that, on at least one occasion, Marquez possessed a handgun in the furtherance of a drug trafficking crime. With the application of the two-level firearm enhancement, Marquez's guideline range of imprisonment on count one became life in prison.

Before the district court imposed a sentence, the government reminded the court "that the forfeiture provision [was] part of the indictment to which [Marquez] pled guilty as [was] the money judgment." Immediately after this reminder, the district court asked Marquez if he knew "of any legal reason why sentence should not be imposed." Marquez responded in the negative.

After this response, the district court sentenced Marquez to life in prison on count one, to run concurrently with a 240-month sentence on count two. He was ordered to serve a total of five years of supervised release and to pay a total of $5,000 in fines. At sentencing, the district court did not orally pronounce forfeiture as part of Marquez's sentence. Marquez did not object to the district court's omission.

Marquez filed a notice of appeal on May 23, 2011. Two days later, the district court signed Marquez's criminal judgment that ordered Marquez to forfeit $2,000,000. On June 7, 2011, the district court belatedly granted the government's presentencing motion and ordered that a $2,000,000 money judgment be included in the criminal judgments of Marquez and his coconspirators.

**II.**

On appeal, Marquez challenges the application of the firearm and leadership enhancements. In addition, he contends that the $2,000,000 money judgment should be vacated because it was imposed in a procedurally improper manner. We consider each set of issues in turn.

No. 11-50477

## A.

### 1.

The Sentencing Guidelines provide for a "two-level increase in the offense level for a drug trafficking offense '[i]f a dangerous weapon (including a firearm) was possessed.'" *United States v. Jacquinot*, 258 F.3d 423, 430 (5th Cir. 2001). For this enhancement to apply, the government must prove, by a preponderance of the evidence, that the defendant possessed the weapon. *Id.* There are two approaches the government can take in proving the applicability of this enhancement. "First, the government can prove that the defendant personally possessed the weapon by showing that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Hooten*, 942 F.2d 878, 882 (5th Cir. 1991). Second, "when another individual involved in the commission of an offense possessed the weapon, the government must show that the defendant could have reasonably foreseen that possession." *Id.*

A district court's decision to apply this enhancement "is essentially a factual determination reviewable under the clearly erroneous standard." *United States v. Rodriguez*, 62 F.3d 723, 724 (5th Cir. 1995). A finding is "clearly erroneous if, on the entire evidence, we are left with a 'definite and firm conviction' that a mistake has been committed." *United States v. Brown*, 650 F.3d 581, 589 (5th Cir. 2011) (citation omitted). Because the district court considered this enhancement under the first approach, we limit our analysis to determining whether the district court clearly erred in concluding that Marquez personally possessed a firearm during the drug conspiracy.

Generally, under the first approach, "the government must provide evidence that the weapon was found in the same location where drugs or drug paraphernalia are stored or where part of the transaction occurred." *Hooten*, 942 F.2d at 882. The government's burden under this first approach can also be

satisfied if it can establish, by a preponderance of the evidence, that the "defendant possessed a firearm during conduct associated with the offense of conviction." *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006).

Here, the district court heard testimony from St. John indicating that it was common knowledge that Marquez carried a firearm. In addition, the district court was presented with testimony from Zurfas suggesting that Marquez would carry a weapon during transactions and that it was not uncommon for him to have a gun while he was making contact with a customer. This testimony from St. John and Zurfas, combined with the discovery of Glock magazines and a bulletproof vest at Marquez's residence, provide support for the application of a firearm enhancement. Given this evidence, we are not left with a definite and firm conviction that the district court erred. As such, the district court's decision to apply this sentencing enhancement is not clearly erroneous.

**2.**

A defendant's offense level should be increased four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(a). "In determining whether a defendant is a leader, a court should consider the following factors: 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.'" *United States v. Cooper*, 274 F.3d 230, 247 (5th Cir. 2001) (quoting U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. n.4). The district court's determination that the role Marquez played was that of a leader or organizer of the conspiracy is a finding of fact that we review for clear error. *United States v. Curtis*, 635 F.3d 704, 720 (5th Cir. 2011).

No. 11-50477

In this case, the district court's decision to apply this enhancement is firmly supported by the testimony presented at sentencing. As recounted above, St. John testified that Marquez was the leader of a drug distribution cell. Additionally, he also stated that Marquez directed six other individuals. In further support of this enhancement, Zurfas testified that he intercepted a conversation between Marquez and Blas during which Marquez asked Blas if he was ready to take the helm of the distribution network that Marquez had established. Like St. John, Zurfas also stated that Marquez directed six to seven other individuals. This testimony, combined with the information contained in Marquez's PSR, establishes the plausibility of the district court's decision to apply this enhancement. Because it is plausible in light of the record as a whole, the district court's decision is not clearly erroneous. *See United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (citation omitted) ("There is no clear error if the district court's finding is plausible in light of the record as a whole.").

**B.**

As stated earlier, Marquez is also challenging the $2,000,000 money judgment entered against him. According to Marquez, the money judgment order was improperly issued because the district court failed to comply with the procedural requirements set forth in Federal Rule of Criminal Procedure 32.2.

Rule 32.2 sets forth three general preliminary steps that must be followed in criminal forfeiture proceedings. First, it provides that a "court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek forfeiture of property as part of any sentence in accordance with the applicable statute." Fed. R. Crim. P. 32.2(a). In providing this notice, the indictment need not "specify the amount of any forfeiture money judgment that the government seeks." *Id.* Second, as relevant here, Rule 32.2 states that as soon as practical

11

after a guilty plea is accepted, "on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A). This determination "may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). If the government is seeking a personal money judgment, "the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). Third, "[i]f the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment." Fed. R. Crim. P. 32.2(b)(2)(A). "Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final." Fed. R. Crim. P. 32.2(b)(2)(B).

A preliminary order becomes final as to the defendant at sentencing or "at any time before sentencing if the defendant consents." Fed. R. Crim. P. 32.2(b)(4)(A). When orally announcing the sentence, the court must include the forfeiture "or must otherwise ensure that the defendant knows of the forfeiture at sentencing." Fed. R. Crim. P. 32.2(b)(4)(B). "The court must also include the forfeiture order, directly or by reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36." *Id.*

These procedures are not empty formalities. Rather, they serve a vital function in ensuring that a defendant has notice of a criminal forfeiture and an opportunity to challenge any forfeiture sought by the government. In addition, these procedures also ensure that the statutory requirements for criminal forfeiture have been satisfied. Given their importance, it is unsurprising that these procedures are mandatory.

No. 11-50477

Here, the district court did not abide by Rule 32.2's requirements. The record before us does not indicate that the district court made a forfeiture determination as soon as practicable after Marquez's guilty plea was accepted. Nor does it show the entry of a preliminary order of forfeiture setting forth the amount of the money judgment. Despite being on notice of the forfeiture and having the opportunity to object, Marquez did not object to the district court's failure to adhere to Rule 32.2's requirements.[1] Our review of this issue is therefore limited to plain error.

On plain error review, Marquez "bears the burden of proving (1) error, (2) that is plain, and (3) that affects his substantial rights." *United States v. Mason*, 668 F.3d 203, 208 (5th Cir. 2012) (citations omitted). "If [he] satisfies the first three prongs of the plain error analysis, we proceed to the fourth prong, which affords us 'the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

Marquez has satisfied his burden with respect to the first two prongs of the plain error analysis. Given the clarity of Rule 32.2's general instructions, the aforementioned deficiencies in the district court's handling of the forfeiture are plainly erroneous. Despite this conclusion, Marquez is not entitled to relief. Under the third prong of the plain error analysis, Marquez has the burden of showing that these procedural defects affected his substantial rights. "As a general rule, an error affects a defendant's substantial rights only if the error

---

[1] Forfeiture was mentioned in the indictment and at rearraignment. In addition, forfeiture was raised in the government's presentencing forfeiture motion and in Marquez's PSR. Finally, this issue was also raised during sentencing. Despite these repeated reminders of the government's request for a forfeiture, Marquez did not invoke his right to challenge the forfeiture. *See* Fed. R. Crim. P. 32.2(b)(1)(B) ("If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty."). Nor did he lodge any objection to the forfeiture.

13

No. 11-50477

was prejudicial." *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 364 (5th Cir. 2010) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). "Error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error." *Id.* (citation omitted). "The probability of a different result must be sufficient to undermine confidence in the outcome of the proceedings." *Id.* (citation omitted).

Marquez has not satisfied his burden of demonstrating that the district court's failure to abide by Rule 32.2 affected his substantial rights. Put simply, he has failed to show that there is a reasonable probability the result of his proceedings would have been any different had the district court followed the appropriate procedures. Conceivably, Marquez could have satisfied his burden by showing that, had the district court complied with Rule 32.2, there was a reasonable probability that any forfeiture imposed would have been less than $2,000,000. But rather than attempting to satisfy this burden, Marquez simply focuses on the district court's errors independent of any prejudice they may have caused. His failure to satisfy this burden prevents him from obtaining relief on appeal. Because he has not demonstrated that his substantial rights were affected by the district court's errors, Marquez is not entitled to relief.

### III.

For these reasons, we AFFIRM the district court's judgment.

14