# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2013

No. 12-50027

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ANTHONY FRANCIS VALDEZ,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, OWEN, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

The defendant Anthony Valdez, a psychiatrist, challenges multiple aspects of his trial and sentence in this money laundering and health care fraud case. He argues that there is insufficient evidence to support his conviction for money laundering; that the district court erred in applying various enhancements to his sentence; that the jury should have been retained to decide issues relating to the forfeiture of his property; that the court erred in admitting evidence of medical malpractice; and that the cumulative effect of multiple errors requires reversal. We affirm the conviction and sentence, including the judgment of forfeiture.

No. 12-50027

## I. Factual and Procedural Background

Anthony Valdez operated two pain management clinics under the name of International Institute of Pain Management, located in El Paso and San Antonio, Texas. The indictment alleged that Valdez provided patients with prolotherapy, a "medical procedure purported to strengthen lax ligaments or to relieve pain by injecting an irritant. . . such as dextrose, glycerin, calcium and phenol, around a painful joint to provoke a biological response that results in the growth of new cells." However, Valdez billed federal and state health insurance programs Medicare, Medicaid and Tricare (collectively called "the Programs") for facet joint injections, which temporarily eliminate pain by injecting anesthetics and/or steroids into facet joints in the vertebrae, and peripheral nerve injections, which temporarily eliminate pain by injecting anesthetics near a nerve. Prolotherapy is not reimbursable by the Programs, whereas facet joint and peripheral nerve injections are reimbursable. The indictment alleged that Valdez submitted insurance claims to the Programs under the codes for facet joint and peripheral nerve injections rather than the prolotherapy injections actually performed. The indictment further alleged that Valdez billed for "Level 4" office visits, which entail extended examination and evaluation, that did not occur, and that he trained and instructed his employees to perform and fraudulently bill for the same services. The indictment also alleged that Valdez engaged in financial transactions involving the proceeds of health care fraud with the intent to promote unlawful activity and to conceal the proceeds of his health care fraud, and engaged in monetary transactions with criminally derived funds of $10,000 or more. The indictment included a forfeiture demand.

Valdez was tried by a jury and convicted of one count of conspiracy to commit health care fraud, 18 U.S.C. §§ 1349 and 1347 (Count 1); six counts of health care fraud relating to six specific patients, *id*. § 1347 (Counts 2-7); six counts of false statements relating to health care matters relating to six specific

No. 12-50027

insurance claims, *id.* §1035 (Counts 8-13); one count of money laundering, *id.* § 1956(a)(1) (Count 14); and two counts of engaging in monetary transactions in property derived from unlawful activity, *id.* § 1957 (Counts 15-16).

Trial testimony from patients and expert doctors supported the allegations that Valdez actually performed prolotherapy when he billed the Programs for facet joint or peripheral nerve injections. The evidence included testimony that during a Texas Department of Insurance medical review, Valdez told Dr. Suzanne Novak that he did prolotherapy, and during that same review told Dr. Howard Smith that he only performed prolotherapy but called it "reconstructive anesthetic blocks" in order to bill insurance carriers who would not cover prolotherapy. Trial evidence, including testimony from employees, patients, and doctors, including doctors who reviewed video of Valdez performing procedures, indicated that Valdez's medical practices were consistent with prolotherapy and inconsistent with facet joint or peripheral nerve injections, including that he injected too much solution to be performing facet joint injections, repeatedly injected patients which would not be advisable if the injections were facet joint or peripheral nerve injections, did not have a fluoroscope (a type of x-ray machine typically used for facet injections), did not have steroids that are typically injected in facet joint injections but did have solutions consistent with prolotherapy, used a patient encounter form that included a section for prolotherapy but not facet joint or peripheral nerve injections, and advertised prolotherapy but not facet joint or peripheral injections. The evidence also supported the allegations that Valdez trained his employees to perform prolotherapy but not facet joint or peripheral nerve injections, including testimony from Rose Chavez, office manager at the El Paso clinic, who stated that prolotherapy was performed at both clinics, but not facet joint or peripheral nerve injections. Chavez also testified that she spoke to Valdez about the billing for prolotherapy after reading some material from a pain management seminar

that stated that prolotherapy was not reimbursable by the Programs. Chavez testified that she mentioned the billing information to Valdez, but Valdez instructed Chavez to disregard it.

With regard to money laundering,  at trial the government presented Emmanuel Gomez, an FBI agent who analyzed Valdez's financial records. Agent Gomez testified about Valdez's receipt and spending of reimbursements from the Programs over the course of the five-year period. The evidence showed that the proceeds of the fraudulent billing scheme were directly deposited from the Programs into two of Valdez's bank accounts. Based on Agent Gomez's analysis of the financial records, Valdez wrote checks from these accounts to pay employee salaries and loans, to make investments, to purchase property, to make deposits into multiple investment accounts, and to purchase multiple vehicles classified as business transportation.

At sentencing, the district court adopted the pre-sentence investigation report ("PSR"), calculated a guidelines range of life,  overruled all of Valdez's objections to the PSR, and imposed the following sentence:

| Counts 1-7: | 120 months, 18 U.S.C. §§ 1347, 1349 |
| Count 8: | 60 months, 18 U.S.C. § 1035 (to run consecutive) |
| Counts 9-13: | 60 months, 18 U.S.C. § 1035 |
| Count 14: | 240 months, 18 U.S.C. 1956(a)(1) |
| Counts 15-16: | 120 months, 18 U.S.C. § 1957 |

The district court sentenced Valdez to the statutory maximum for all offenses, and ordered that the 60-month sentence for Count 8 run consecutive with the other sentences, for a total of 300 months of confinement.

The court also imposed three years of supervised release on all counts, ordered $13,356,645.44 restitution to federal and state insurance programs and private insurers, and ordered a mandatory assessment of $1600. The court also ordered forfeiture of Valdez's property, as requested by the government,

No. 12-50027

including the contents of multiple bank accounts, real property, the proceeds from the sale of real property, four vehicles, and a money judgment of over nine million dollars.

## II. Discussion

### A.    Money Laundering Conviction

Valdez argues that the evidence was insufficient to support his conviction on one count of money laundering under 18 U.S.C. § 1956(a)(1). "We apply de novo review to a challenge to the sufficiency of the evidence, viewing the evidence in the light most favorable to the verdict and upholding the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt." *United States v. Pennell*, 409 F.3d 240, 243 (5th Cir. 2005).

Section 1956(a)(1) requires the government to prove the following elements: (1) Valdez conducted a financial transaction; (2) which he knew involved proceeds arising from a specified unlawful activity; (3) with the intent to promote or further those illegal actions ("the promotion prong"); *or* (4) with the knowledge that the transaction's design was to conceal or disguise the nature or source of the illegal proceeds ("the concealment prong"). *See* 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i); *Pennell*, 409 F.3d at 243. The two prongs are alternative ways to commit the offense; since Valdez was charged with both prongs in one count, the government must establish guilt under one prong or the other. *See, e.g., United States v. Meshack*, 225 F.3d 556, 580 n.23 (5th Cir. 2000), *amended on reh'g in part*, 244 F.3d 367 (5th Cir. 2001); *United States v. Seher*, 562 F.3d 1344, 1361-62 (11th Cir. 2009) (reviewing cases from multiple circuits). Valdez argues that there is insufficient evidence supporting either prong and that the district court plainly erred by not giving a specific unanimity jury charge regarding money laundering. We find that although there is insufficient evidence of concealment money laundering, there is sufficient evidence to sustain Valdez's conviction for money laundering based on promotion of

unlawful activity, and that it was not plain error for the court not to give a specific unanimity instruction.

### 1.    Concealment Money Laundering

The concealment prong of § 1956(a)(1) requires the government to establish that the dirty money transactions are "designed. . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the money involved. 18 U.S.C. § 1956(a)(1)(B)(i)*; see United States v. Brown*, 553 F.3d 768, 786 (5th Cir. 2008).  To establish the design element, the government must demonstrate that the charged transactions had the purpose, not merely the effect, of "mak[ing] it more difficult for the government to trace and demonstrate the nature of th[e] funds."  *Brown*, 553 F.3d at 787 (citing *Cuellar v. United States*, 553 U.S. 550 (2008)).  We have explained that: "In one sense, the acquisition of *any* asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form.  But the requirement that the transaction be *designed* to conceal implies that more than this trivial motivation to conceal must be proved."  *United States v. Willey*, 57 F.3d 1374, 1384 (5th Cir. 1995) (citations omitted).  Here, the government relied on Valdez's transfers of funds from his operating accounts to investment accounts, and on Valdez's purchases of property and investments—all done openly, in his name—as proof of concealment money laundering.  None of the transactions pointed to by the government show a specific intent to conceal the nature, location, source or ownership of the funds used.  Valdez did not use false names, third parties, or any particularly complicated financial maneuvers, which are usual hallmarks of an intent to conceal.  *See United States v. Burns*, 162 F.3d 840, 848-49 (5th Cir. 1998); *Willey*, 57 F.3d at 1385 (noting that "a showing of simply spending money in one's own name will generally not support a money laundering conviction").  There is virtually no evidence of a design to conceal, beyond the "trivial motivation"

shown by the acquiring of assets with the proceeds of criminal activity, which *Willey* instructs is insufficient to establish the necessary intent. *Willey*, 57 F.3d at 1384. We thus find that there is insufficient evidence of concealment money laundering, and turn to the promotion prong of the money laundering conviction.

### 2.     *Promotion Money Laundering*

To establish money laundering under the promotion prong of § 1956(a)(1), the government must show that the dirty money transaction was conducted with the specific intent to promote the carrying on of the health care fraud. 18 U.S.C. § 1956(a)(1)(A)*; see United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999). Here, the government has characterized two types of transactions as promotion of unlawful activity: (1) Valdez's use of dirty money to purchase vehicles characterized as "business transportation," including vans used to transport patients to and from his pain management clinic; and (2) Valdez's use of dirty money to make irregular payments and "loans" to his employees. Because we find that there is sufficient evidence to support the money laundering conviction based on the payments to employees, it is unnecessary for us to address the purchase of the vehicles.

The government established that Valdez made payments to employees who participated in the fraudulent scheme, whom Valdez had trained or instructed to perform procedures and fraudulently bill the Programs for procedures not performed or office visits that did not occur. The government relies on *United States v. Warshak*, a case in which the Sixth Circuit noted that "it is . . . true that a number of cases support the proposition that payments to employees may constitute sufficient evidence of an intent to promote an unlawful activity." 631 F.3d 266, 318 (6th Cir. 2010) (citing *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) ("[T]he promotion element [was] satisfied when a defendant paid his subordinate employee for being involved in an unlawful scheme, because such payments compensated the employee for his illegal

activities and encouraged his continued participation.")).  Valdez argues that these payments to employees were simply payroll payments and thus legitimate business expenses, which cannot constitute promotion money laundering.  *See United States v. Miles*, 360 F.3d 472, 477 (5th Cir. 2004); *Brown*, 186 F.3d at 671.  However, we need not go so far as to hold that normal payroll payments to employees of a business that is not wholly illegitimate constitute promotion of illegal activity.  The record shows that many of the "payroll" payments Valdez made to employees were in fact very irregular, classified not as salary but as "loans," undercutting Valdez's argument that they were normal business expenses rather than payments to secure loyalty or cooperation in the fraudulent scheme.  Further, there is a clear nexus between the payments and the fraud.  The record reflects that Valdez made the payments to subordinates responsible for carrying out essential elements of the fraud: performing prolotherapy injections and submitting fraudulent claims predicated on those injections.  At trial, Rose Chavez testified that she was responsible for preparing the fraudulent claims to Medicare.  Chavez also testified that Luis Cordova performed prolotherapy injections that she billed to Medicare.  Additionally, two of Valdez's former patients testified that they received prolotherapy injections from Dr. Benson Chee, Irma Sanchez, Ricardo Rios, Luis Cordova, James Shea, and Alejandro Rios.  All of these employees, in addition to several others, received payments from Valdez, including irregular payments characterized not as payroll but as "loans."  The evidence also establishes that at least one of the employees who received the payments—office manager Rose Chavez—knew that Valdez's billing practices were fraudulent.  Indeed, Chavez testified that she continued to knowingly submit fraudulent claims because she knew that by not saying anything, she would continue to get paid.  Viewing this evidence in the light most favorable to the verdict, we conclude that a jury could draw the reasonable inference that these employees received payments to encourage their

continued participation in the fraudulent scheme, and thus that the payments promoted the ongoing healthcare fraud.  We therefore affirm Valdez's conviction of money laundering.

      3.    *Unanimity Instruction*

Valdez also argues that the district court erred by not giving the jury a specific unanimity charge regarding the money laundering count.  Though a general unanimity charge was given, Valdez argues that the district court was required to instruct the jury that it had to unanimously agree that he was guilty of money laundering based on promotion, concealment, or both, and that a general verdict on that count is not sufficient.  Valdez did not object to the instruction; thus, we review only for plain error.  *See United States v. Alford*, 999 F.2d 818, 824 (5th Cir. 1993).  In *Alford*, a previous case in which the defendant made a similar argument, this court held that "The district court's failure to include a unanimity instruction in this case does not rise to the level of plain error." *Id.*  Valdez argues that *Alford* conflicts with *Richardson v. United States*, which held that a jury in a "continuing criminal enterprise" case is required to agree unanimously not only that the accused committed a continuing series of violations, but also which specific violations made up the continuing series.  *See* 526 U.S. 813, 815 (1999) (interpreting  21 U.S.C. § 848(a)).  This court has already considered and rejected the argument that *Richardson* alters the holding of *Alford*. *See Meshack*, 225 F.3d at 579-80.  Valdez's argument is foreclosed.  The district court did not plainly err by not giving a specific unanimity instruction on the money laundering count.

**B.**    **Sentencing Enhancements**

Valdez also argues that the district court miscalculated the applicable sentencing range under the 2010 U.S. Sentencing Guidelines Manual by erroneously applying multiple sentencing enhancements.   The specific

No. 12-50027

enhancements he challenges are: (1) the 2-level vulnerable victim enhancement, § 3A1.1(b)(1); (2) the 2-level multiple vulnerable victims enhancement, § 3A1.1(b)(2); (3) the 2-level abuse of trust enhancement, § 3B1.3; (4) the 2-level mass-marketing enhancement, § 2B1.1(b)(2)(A)(ii); (5) the 2-level sophisticated means enhancement, § 2B1.1(b)(9)(C), and; (6) the district court's calculation of loss under § 2B1.1(b)(1), which increased his offense level by 22 levels, §2B1.1(b)(1)(L).

We review sentences for reasonableness under an abuse of discretion standard. *See United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). First, we determine whether the district court committed any procedural error, such as improperly calculating the Guidelines range. *Id.* If there is no procedural error or the error is harmless, we may review the substantive reasonableness of the sentence. *Id.* Valdez argues only that the district court procedurally erred by miscalculating the applicable Guidelines range. Because Valdez objected to all the enhancements that he now challenges on appeal, we review the district court's interpretation and application of the Guidelines de novo, and review findings of fact for clear error. *Cisneros-Gutierrez,* 517 F.3d at 764 (quotation omitted). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Id.*

### 1.    *Vulnerable Victim and Multiple Vulnerable Victims*

The district court added two levels to Valdez's offense level based on § 3A1.1(b)(1) which applies "If the defendant knew or should have known that a victim of the offense was a vulnerable victim," and added two additional levels based on § 3A1.1(b)(2), which applies if "the offense involved a large number of vulnerable victims." A"vulnerable victim" is a person "who is a victim of the offense of conviction" and any relevant conduct, as defined by § 1B1.3, "who is unusually vulnerable due to age, physical or mental condition, or who is

10

otherwise particularly susceptible to the criminal conduct." § 3A1.1(b) cmt. n. 2. For purposes of this enhancement, "victim" is defined broadly. Specifically, "the 2–level adjustment of §3A1.1(b)(1) applies not only to victims of the offense of conviction, but also to victims of any relevant conduct for which the Guidelines make the defendant accountable." *United States v. Salahmand*, 651 F.3d 21, 26 (D.C. Cir. 2011); *see also United States v. Moon*, 513 F.3d 527, 541 (6th Cir. 2008)*; United States v. Zats*, 298 F.3d 182, 186-87 (3d Cir. 2002). The district court applied both enhancements because a number of Valdez's patients were elderly Medicare recipients and low-income Medicaid recipients.

On appeal, Valdez does not argue that his patients were not "vulnerable," but argues that the primary victim of the offense was the federal government and that no patients were victims at all because the government did not prove that any of them were harmed medically or financially.[1]

This court has "previously recognized that a physician's patients can be victimized by a fraudulent billing scheme directed at insurers or other health care providers." *United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997). In applying this enhancement to similar cases involving health care fraud, we have drawn a distinction between fraud schemes that "benefitted" patients, *see United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999) (finding that patients were not victims where scheme to submit false claims for ambulance services provided them with a free ride to the hospital), and cases "in which patients suffered harm or at least potential harm from the fraudulent scheme," *id*.; *see United States v. Burgos*, 137 F.3d 841, 844 (5th Cir. 1998) (finding that patients were victims where they "were often admitted to the hospital needlessly or their stays in the hospital were extended beyond what was necessary"); *Sidhu*, 130

---

[1] Valdez is clearly correct that the United States government is not a vulnerable victim. *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999).

F.3d at 655 (patients were victims where they "were often debilitated by pain or depression, and easily became addicted to the treatment proffered by [the defendant] to support his fraud"); *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) (patients were victims where unnecessary treatment was frequently ineffective and in some cases harmful to the patients).

Although Valdez argues that his patients benefitted from his treatment, the district court's finding that at least some of his patients were victims of his relevant conduct is "plausible in light of the record as a whole." *Cisneros-Gutierrez,* 517 F.3d at 764. At trial, Dr. Smith and Dr. Novak testified that Valdez risked causing numbness, weakness, pain and possibly permanent nerve damage to his patients. Both doctors referenced specific patients, including one who received approximately 357 injections, and one who received 500 injections in a three-year period. The pre-sentence investigation report showed that multiple patients reported that employees of Valdez's clinic told them they had to have the injections in order to have their prescriptions for pain medication filled. Valdez treated his Medicare- and Medicaid-dependent patients, who were seeking treatment for pain, "during the commission" of his fraudulent billing, when he required patients to receive the injections and then billed the Programs for those injections. *See Salahmand*, 651 F.3d at 27 (noting that defendant treated patients "during the commission" of identity theft offense when he was posing as a doctor). Valdez has not shown that the district court clearly erred in finding that Valdez's treatment exposed patients to risks of harm, and sometimes to medical treatment they did not want, and that pain management patients who needed medication were vulnerable to his conduct of requiring they receive the injections so he could fraudulently bill for them.[2]

_____

[2] The government also points to evidence concerning Valdez's prescription of controlled substances, including to patients who were addicted or who had attempted suicide. We do not rely on any evidence concerning prescription drugs in affirming application of the

No. 12-50027

We find that the district court correctly applied the enhancement based on the vulnerability of Valdez's Medicare and Medicaid pain management patients, who it construed as victims of Valdez's relevant underlying conduct.

Lastly, the high number of injection procedures reflected in Valdez's patient files and billing records, and the evidence adduced at trial that indicated that Valdez did not perform facet joint injections or peripheral nerve injections but actually performed prolotherapy in many, possibly even all, instances in which he billed for injections, demonstrates that the district court's finding that a large number of pain management patients were vulnerable victims of Valdez's offenses is plausible in light of the record as a whole. The district court did not err in applying the additional 2-level "multiple vulnerable victims" enhancement.

2.     *Abuse of Trust*

Valdez next challenges the application of a 2-level enhancement under § 3B.1.3 for abusing a position of trust. This section provides an enhancement for defendants who have "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." § 3B1.3. Valdez relies on precedent from the 11th Circuit to argue that a Medicare-funded care provider, as a matter of law, does not occupy a position of trust vis-a-vis Medicare. *See United States v. Mills*, 138 F.3d 928, 941 (11th Cir. 1998). However, as Valdez acknowledges, this argument is foreclosed by circuit precedent. *See United States v. Miller,* 607 F.3d 144, 149 (5th Cir. 2010) (holding that owner of a medical supply store who fraudulently billed Medicare occupied position of trust vis-a-vis Medicare); *United States v. Iloani*, 143 F.3d 921, 922-23 (5th Cir. 1998) (holding that chiropractor occupies a position of

enhancement in this case.

13

trust with regard to the insurance companies that he bills).  The district court did not err in applying the  § 3B1.3 abuse of trust enhancement.

### 3.     *Mass-Marketing*

Valdez next challenges the district court's imposition of a 2-level mass-marketing enhancement under § 2B1.1(b)(2)(A)(ii).  The Guidelines define mass-marketing as a "plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to . . . purchase goods or services. . . ." § 2B1.1 cmt. n. 4(A); *see United States v. Magnuson*, 307 F.3d 333, 335 (5th Cir. 2002).  The district court applied the enhancement based on a flier that Valdez sent via mail to 16,626 El Paso residents in December 2006 and four television commercials shown on local news from April 2008 to December 2009, all advertising his International Institute of Pain Management and "reconstructive therapy," which was prolotherapy.  Valdez relies on *United States v. Miller*, 588 F.3d 560, 562, 568 (8th Cir. 2009) to argue that the enhancement does not apply where the mass-marketing is not targeted at the specific victims of the fraud, which he argues were the Programs.  This argument is foreclosed by circuit precedent.  In *Isiwele*, this court rejected the Eighth Circuit's reasoning in *Miller* and upheld the application of the mass-marketing enhancement to a defendant who had recruited beneficiaries in a scheme to submit fraudulent bills to Medicare for power wheelchairs.  *See United States v. Isiwele*, 635 F.3d 196, 204-05 (5th Cir. 2011).  Likewise, Valdez solicited patients to receive injections, for which he then fraudulently billed the Programs.   The district court did not err in applying the 2-level §2B1.1(b)(2)(A)(ii) mass-marketing enhancement.

No. 12-50027

### 4.    *Sophisticated Means*

Valdez next challenges the application of the 2-level "sophisticated means" enhancement under § 2B1.1(b)(9)(C). Sophisticated means are defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." § 2 B1.1 cmt. n. 8(B). The district court applied this enhancement because, based on the FBI's analysis of Valdez's bank records, it concluded that Valdez was attempting to hide his assets by depositing proceeds from the fraudulent billing scheme into his investment accounts.

Valdez argues that his transfers from his operating accounts to his investment accounts do not constitute sophisticated means. We agree. Valdez used no false names, fictitious entities, shell companies or complicated financial transactions, or any other particularly sophisticated means to hide or conceal the assets. We have affirmed the application of the sophisticated means enhancement in cases involving some method that made it more difficult for the offense to be detected, even if that method was not by itself particularly sophisticated. For example, in *Clements*, we upheld application of the enhancement where the defendant repeatedly converted received funds into multiple cashier's checks made out to himself, which he then deposited into his wife's separate bank account, because his actions "obscure[d] the link between the money and . . . himself," and "undeniably made it more difficult for the IRS to detect his evasion." *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996); *see also United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008) (traveling to 23 different states to obtain information about credit accounts and using a fictitious name and business to conduct fraudulent transactions

15

involved sophisticated means); *United States v. Wright*, 496 F.3d 371, 379 (5th Cir. 2007) (depositing a check into an account and then using money to purchase a cashier's check in another name involved sophisticated means); *United States v. Charroux*, 3 F.3d 827, 837 (5th Cir. 1993) (participation in land flip scheme to purchase property for inflated price involved sophisticated means where defendants "structured elaborate transactions to hide their revenues").

Here, however, the sole reason given for applying this enhancement is that Valdez took money directly deposited from Medicare into his operating account, which was in his name, and moved it into his investment accounts, which were also in his name. Even though this court reviews the factual finding that Valdez used sophisticated means for clear error, *see Clements*, 73 F.3d at 1340, there is no indication that this open and transparent direct deposit and movement of funds involved sophisticated means or could have made it more difficult for his offense of health care fraud to be detected. We hold that the district court erred in applying the 2-level § 2B1.1(b)(9)(C) sophisticated means enhancement.

### 5. *Loss Calculation*

Valdez next challenges the district court's loss calculation. The amount of loss resulting from fraud is a specific offense characteristic that increases the base offense level under the Guidelines. *See* § 2B1.1(b)(1). "Loss" is defined as "the greater of actual loss or intended loss." § 2B1.1 cmt. n. 3(A). "Actual loss" includes "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n. 3(A)(i). "Intended loss" means "the pecuniary harm that was intended to result from the offense," and includes "intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* cmt. n.3(A)(ii). We review the district court's method of

determining loss de novo, while we review background factual findings for clear error. *Isiwele*, 635 F.3d at 202.

Here, the district court calculated the amount of intended loss at over forty-four million dollars based on the gross amount of the fraudulent claims Valdez submitted to the Programs. Valdez argues that because he never expected full reimbursement, the loss intended by his actions was significantly less than this amount. The intended loss calculation raised his offense level by 22. §2B1.1(b)(1)(L).

In health care fraud cases, this court has explained that "our case law requires the government [to] prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level." *Isiwele*, 635 F.3d at 203 (quoting *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003)). In the health care fraud context,

> the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss [the defendant] intended to cause, but the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent.

*Id.* (internal quotation marks and citations omitted); *see also United States v. Singh*, 390 F.3d 168, 193-94 (2d Cir. 2004) (remanding for re-sentencing to give the defendant an opportunity to show that the total amount he expected to receive was less than the amount he actually billed to Medicare/Medicaid).

Here, Valdez objected to the loss calculation at sentencing and argued to the district court that the evidence showed that he did not subjectively intend to cause the loss of the full amount that he billed the Programs. He argued that for years he consistently billed a high amount, knowing that he would only be reimbursed for a fraction of what was billed. Valdez points to trial testimony by Rose Chavez, his office manager, who testified for the government. Her

statements were introduced via an undercover recording with Chavez, who stated on the recording that: "Those are our rates, which are usually based on three times on [sic] what Medicare covers, that's pretty much standard practice." Valdez argues that this evidence rebutted the finding that he subjectively intended to cause the loss of the full amount he billed the Programs. The district court did not reference this evidence in making the loss calculation.

Based on the clear guidance in *Isiwele*, we find that it was error for the district court to calculate the intended loss without considering the evidence in the record that rebutted the prima facie evidence of intended loss. However, we note that even if we assume there was error in the intended loss calculation, and use the amount Valdez actually received from the program to calculate loss—which comes to around thirteen million dollars—Valdez would still receive a 20-level enhancement. *See* § 2B1.1(b)(1)(K).

6.    *Harmfulness of Sentencing Errors*

We have found that the district court erred in applying the 2-level sophisticated means enhancement, and in applying a 22-level increase based on loss calculation without considering the evidence that tended to show that Valdez did not have the subjective intent to cause the loss of the full amount that he billed the Programs. We now consider whether those errors were harmless. *See United States v. Ibarra-Luna*, 628 F.3d 712, 713-14 (5th Cir. 2010) (holding that an error in the calculation of the applicable Guidelines range is subject to a harmless error analysis). "[T]he harmless error doctrine applies only if the proponent of the sentence convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Id.* at 714. To satisfy that high burden, there must be

No. 12-50027

"evidence in the record that will convince us that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error." *Id.* at 718 (quoting *United States v. Huskey*, 137 F.3d 283, 289 (5th Cir. 1998)).

Here, the court sentenced Valdez to 300 months. The original offense level was 43, which together with his criminal history category I, set forth a Guidelines range of life. However, even accounting for the district court's erroneous application of the sophisticated means enhancement and the loss calculation, the offense level would still be 41.[3] The Guidelines range applicable to an offense level of 41, in criminal history category I, is 324-405 months. Thus, the 300 month sentence is within the adjusted Guidelines range.

That the sentence would remain within the adjusted Guidelines range is insufficient to indicate harmlessness; "the crux of the harmless-error inquiry is whether the district court *would* have imposed the same sentence, not whether the district court *could* have imposed the same sentence." *United States v. Delgado-Martinez*, 564 F.3d 750, 753 (5th Cir. 2009). There are two additional factors present in this case which clearly indicate "(1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing."

---

[3] For the health care fraud group of offenses: Base offense level of 6, § 2B1.1(a)(2), plus 20 levels for the calculation of loss, § 2B1.1(b)(1)(K); 2 levels for mass marketing, § 1B1.1(b)(2)(a); 2 levels for reckless risk of death or serious bodily injury (not challenged on appeal), § 2B1.1(b)(13)(A); 2 levels for vulnerable victim, § 3A1.1(b)(1); 2 levels for multiple vulnerable victims, § 3A1.1(b)(2); 2 levels for abuse of trust, § 3B1.1; and 4 levels for an aggravated role in the offense (not challenged on appeal), § 3B1.1(a). Total offense level: 40.

For the money laundering group of offenses: Base offense level of 30, § 2S1.1(a)(2) (adjusted upwards for specific offense characteristics, including 20 levels for loss calculation, 2 levels for mass marketing, and 2 levels for reckless risk of death or serious bodily injury); plus 1 level for violation of § 1957 (not challenged on appeal),§ 2S1.1(b)(2)(A); 2 levels for vulnerable victim, § 3A1.1(b)(1); 2 levels for multiple vulnerable victims, § 3A1.1(b)(2); 2 levels for abuse of trust, § 3B1.1; and 4 levels for an aggravated role in the offense (not challenged on appeal), § 3B1.1(a). Total offense level: 41. The group with the highest level is used.

No. 12-50027

*Ibarra-Luna*, 628 F.3d at 714. First, the district court imposed consecutive sentences for factually related offenses. This court has recognized that "the imposition of consecutive sentences may, under some circumstances, demonstrate" that a Guidelines error was harmless. *See United States v. Woods*, 440 F.3d 255, 260 (5th Cir. 2006); *United States v. Garza*, 429 F.3d 165, 170 (5th Cir. 2005) (identifying imposition of consecutive sentences as one of only two circumstances in which this court has found a *Booker* sentencing error to be harmless). Where one of the consecutive sentences is for "entirely unrelated conduct," this court ascribes no motivation to the district court "other than adherence to the default rule that totally unrelated crimes should ordinarily receive distinct punishment." *Woods,* 440 F.3d at 260. Here, by contrast, the district court imposed multiple concurrent sentences and one consecutive sentence on one of the counts of health care fraud. The conduct was all part of the same fraudulent scheme and all the charges were factually related offenses. Thus, the court's "conscious decision not to award a concurrent sentence," *United States v. Prones*, 145 Fed. App'x 481, 482 (5th Cir.2005), *cert. granted, judgment vacated on other grounds*, 549 U.S. 1093 (2006), shows that the court purposefully fashioned a sentence it thought was fair in the circumstances, and weighs in favor of finding that the sentencing errors were harmless, *id.; cf. Woods*, 440 F.3d at 260. The second factor tending to demonstrate that the sentencing errors were harmless is the district court's statement that it would impose the same 300-month sentence on remand. At the sentencing hearing, the district court stated:

> THE COURT: I'll inform you right now, Mr. Torres [defense counsel at sentencing], if you take up an appeal and the appeal comes back for re-sentencing, I will fashion a sentence that will meet the 300-month sentence that I've given him. If I miscalculated the guideline range and it comes back because of that, there's still a lot to work with.

No. 12-50027

This unequivocal statement certainly constitutes "evidence in the record that will convince us that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error." *Ibarra-Luna*, 628 F.3d at 718. Though Valdez argues that this statement indicates that the judge was biased, it is merely a characterization of the discretion the district court had in fashioning this sentence. Where the sentence remains within the adjusted Guidelines range, this statement is clear evidence that the district court "*would have imposed the same sentence*" absent the guidelines calculation errors, not simply that it "*could* have. . . ." *Delgado-Martinez*, 564 F.3d at 753.

We therefore hold that although the district court erred with respect to the sophisticated means and loss calculation enhancements, those errors were harmless, and affirm the sentence.

## C.    Forfeiture

Valdez next argues that it was error for the district court not to inquire whether either party requested that the jury make the forfeiture determination with regard to specific property, as provided by Federal Rule of Criminal Procedure 32.2(b), before the jury began deliberations. The district court issued an order of forfeiture, which imposed a money judgment against Valdez in the amount of $9,741,649, and ordered him to forfeit to the United States all of his right, title, and interest in two real properties, four vehicles, and the contents of several bank and investment accounts. Because Valdez failed to object, we review this claim for plain error pursuant to Rule 52.[4] Fed. Rule Crim. P. 52(b). On plain error review, Valdez "bears the burden of proving (1) error, (2) that is plain, and (3) that affects his substantial rights." *Johnson,* 520 U.S. at 466-67;

---

[4] Contrary to Valdez's argument that the errors implicating the interpretation of a Rule of Criminal Procedure are somehow immune from the rule requiring preservation, even "the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." *Johnson v. United States*, 520 U.S. 461, 466 (1997).

21

*Puckett v. United States*, 556 U.S. 129, 135 (2009).  If the first three prongs are satisfied, the court has "the discretion to remedy the error . . . if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135.

Criminal forfeiture is a part of sentencing imposed after conviction; it is not a substantive element of the offense. *See Libretti v. United States*, 516 U.S. 29, 41 (1995). There is no constitutional right to a jury determination of forfeiture. *Id.* at 49.  However, Rule 32.2(b) provides that "if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." Fed. R. Crim. Pro. 32.2(b)(5)(A).  We assume that the district court clearly erred in not determining whether either party requested that the jury determine forfeiture, given the clarity of the instructions in Rule 32.2. *Id.*; *see United States v. Marquez*, 685 F.3d 501, 509-10 (5th Cir. 2012). With regard to the effect on his substantial rights, Valdez argues that since the district court imposed the full forfeiture sought by the government, there is a reasonable probability that a jury would have imposed less forfeiture.  However, the government produced trial evidence showing that Valdez kept the proceeds of his health care fraud in his bank and investment accounts, and used the proceeds of the fraud to purchase specific property, vehicles, and investments. Regardless, even assuming that Valdez could show that the failure to submit forfeiture to the jury affected his substantial rights, we find that the error does not meet the final requirement of the plain error standard.  *See Johnson*, 520 U.S. at 469-70.   Given that there is no constitutional right to a jury determination of forfeiture, that there is sufficient evidence tying the forfeited property to the proceeds of Valdez's health care fraud, and that during the trial

Valdez never indicated that he wished the jury to determine forfeiture, we decline to vacate the forfeiture order on plain error review.

## D.    Admission of Medical Malpractice Evidence

Valdez next argues that the district court erred in admitting testimony of physician witnesses who referred to Valdez's prolotherapy procedures as substandard or not medically necessary.  He argues the testimony was not relevant pursuant to Federal Rule of Evidence 402 and that the prejudicial effect outweighed any probative value pursuant to Federal Rule of Evidence 403.  He did not object to the testimony at trial, and thus review is for plain error. *See United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 362 (5th Cir. 2010).

The specific testimony challenged by Valdez includes: (1) two doctors' testimony that the standard of medical care required using fluoroscopy in facet joint injections, and that Valdez did not use a fluoroscope in his practice; (2) one doctor's testimony that Valdez's practice of not obtaining consent forms before performing facet joint injections would violate the medical standard of care; (3) two doctors' testimony that it would not be "medically reasonable" or "medically accepted" to give a patient the number of facet joint injections that Valdez administered or to give them as frequently as he did; (4) one doctor's testimony that the standard of care required that medications with expired dates be thrown away, after the government had introduced photographs taken from Valdez's office which appeared to show expired medications, and; (5) a pain management doctor's testimony that, after conducting a peer review of Valdez's practice, that "I found it [the medical care provided by Valdez] substandard."

The district court gave the jury a limiting instruction regarding any testimony of medical malpractice.  That instruction provided:

> You have heard evidence of acts of the defendant which may be similar to those charged in the superseding indictment, but which

were committed on other occasions. You also heard opinion testimony alleging medical malpractice by the defendant. You must not consider any of this evidence in deciding if the defendant committed the acts charged in the superseding indictment.

Valdez did not object to this instruction. This limiting instruction concerning medical malpractice testimony was added by the district court.

We hold that there was no error in admitting the testimony here, much less plain error. The opinion testimony concerning medical malpractice was elicited in response to Valdez's defense, which was that he was actually performing facet joint injections as defined by the Medicare guidelines. Because Valdez contended that all the procedures which the government argued were prolotherapy were actually facet joint injections, it was necessary for expert doctors for the government to explain the difference between facet joint injections and prolotherapy, including the testimony that if Valdez were actually performing facet joint injections as he contended, then they were not correctly performed. The medical testimony as a whole focused on a core factual dispute—whether Valdez was performing prolotherapy or facet joint injections—and the testimony that Valdez now complains about was largely ancillary to that purpose. The judge gave a limiting instruction on his own initiative. A limiting instruction minimizes the danger of undue prejudice. *See, e.g., United States v. Cooks*, 589 F.3d 173, 183 (5th Cir. 2009). While some of the government's questioning went beyond the purpose of distinguishing prolotherapy from facet joint injections, such as the questioning about whether expired medications should be thrown out or questions about whether Valdez's practice was substandard in general, those questions were limited in the context of the medical testimony as a whole, and the danger of any potential resulting prejudice was reduced by the limiting instruction. For these reasons, Valdez has not proven that the introduction of this testimony was error.

## E.    Cumulative Error

Valdez next argues that cumulative errors during his trial necessitate reversal.  *See United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (describing the cumulative error doctrine).  The only errors that we have found—erroneous application of two sentencing enhancements and the failure to inquire whether either party requested that the jury determine forfeiture—relate to sentencing and thus clearly do not require reversal of the convictions.

Valdez also argues that four times, government witnesses testified to a legal conclusion that improper billing was fraud, or that in the witness's opinion, Valdez had committed fraud.  Federal Rule of Evidence 704(a) prohibits a witness from offering an opinion on the legal conclusion that a defendant had the mental state that constitutes an element of the offense; however, the defendant must make a timely objection to preserve the error if it occurs.  *See United States v. Setser*, 568 F.3d 482, 495 (5th Cir. 2009).  Valdez objected only to one instance of this testimony.  Further, the district court instructed the jury that it should not accept the opinions of experts, but must make their own judgments about the evidence.  Given the brevity of the challenged comments and the overall weight of the incriminating evidence against Valdez, any error was harmless and does not justify reversal. *See Setser*, 568 F.3d at 495.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the conviction and sentence.[5]

---

[5] Valdez also requested reassignment on remand, arguing that the district court showed bias against him.  We need not reach this issue because we do not remand the case.  However, we note that we find no evidence of bias in this case.